[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] Memorandum of Decision
 Rule to Show Cause [182.75]
Trial of this marriage dissolution action took place on April 16 and 17, 1998. The court's memorandum of decision was filed on May 12, 1998. Judgment was entered on that date. CT Page 14447
This action was returnable to this court on January 7, 1997. During the fifteen months before the April 1998 trial, plaintiff, Nancy Weinstein, conducted extensive discovery; most was directed to the value of the defendant's, Luke A. Weinsteins's, minority interest in a corporation, Product Technologies, Inc., or "PTI."
Prior to the April 1998 trial, defendant had filed numerous financial affidavits in connection with various pendente lite proceedings. With one exception, defendant consistently stated the value of his interest in PTI was $40,000. On an April 15, 1998 affidavit, defendant stated the value was $15,000.
At trial, defendant again filed an affidavit reporting the value was $40,000.
The principal financial orders in the judgment were: (1) defendant pay plaintiff $100,000 within 60 days, (2) defendant pay plaintiff rehabilitative alimony of $1,000 per month for five years, (3) defendant pay child support of $187 per week in accordance with an agreement of the parties, and as of September 1, 1998, child support was to be recomputed in accordance with the child support guidelines. Defendant was to provide life insurance on his life in the amount of $150,000 naming the parties' daughter as irrevocable beneficiary during her minority. Defendant also had to provide health insurance for the daughter. Defendant retained all his interest in PTI. Memorandum of Decision, May 12, 1998, pp. 2-3. [170]
On July 1, 1998, PTI and its stockholders (Mangino, Weinstein, etc.) signed a Memorandum of Understanding with ICL, Inc. whereby it was agreed "the Shareholders [of PTI] shall sell to ICL and ICL shall purchase from the Shareholders [of PTI] all of the issued and outstanding shares of Product Technologies, Inc." The consideration for the sale of Shares was six million dollars ($6,000,000). The contemplated closing date was on or before September 30, 1998. Memorandum of Understanding, July 1, 1998. Exhibit 14. At that time, defendant owned 19.4% of the outstanding shares of PTI. Id.
On October 1, 1998, all the stock of PTI, including defendant's, was sold to ICL for $6 million. Eventually, defendant's received $1,449,721.10 for his interest. Letter dated November 7, 2000, Attorney Richard E. Rieder to Luke Weinstein. Exhibit 15.
In January or February 1999, plaintiff learned that PTI had been sold. Because only two months elapsed between the mid-April 1998 trial and an understanding reached to sell for $6,000,000, plaintiff understandably questions whether the sale was known, or at least anticipated in some CT Page 14448 form, at or before the time of trial.
The plaintiff and or her counsel ordered transcripts of the April 1998 trial. Eventually, plaintiff filed the instant Rule To Show Cause claiming fraud by the defendant. She seeks to open the judgment and the entry of financial orders consistent with the now greatly increased wealth of the defendant.
On September 1, 1999, plaintiff filed a Rule to Show Cause dated August 4, 1999. [182.75] It is set forth verbatim:
 RULE TO SHOW CAUSE
TO THE SUPERIOR COURT, JUDICIAL DISTRICT OF MIDDLESEX:
 NOW COMES, Nancy Weinstein, a resident of the Town of Essex, County of Middlesex and State of Connecticut, and complains and says:
 1. On May 12, 1998, after trial to the Court (Higgins, J.) a judgment of dissolution of marriage was entered in the above captioned matter.
 2. The Plaintiff had pursued discovery during the pendency of the matter with respect to valuing the interest of the Defendant in his business, known as Product Technologies, Inc.
 3. During the pendency of the matter, the Defendant had provided certain financial information about his interest in his business, and the Plaintiff had employed a Business Evaluator to establish a value for the Defendant's interest in his business. Said Business Evaluator relied on Defendant's representations in reaching conclusions concerning the value of Defendant's interest in his business.
 4. During the pendency of the matter, the Plaintiff had deposed the Defendant, requesting from the Defendant extensive information about the financial aspects of his business, as well as other information about the Defendant's financial affairs.
 5. At the time of trial, Defendant submitted a financial affidavit, placing a value on his interest in said business of Forty Thousand ($40,000.00) CT Page 14449 Dollars.
 6. During said trial, testimony was presented concerning the value of the interest of the Defendant in his business, said testimony based on financial documents provided by the Defendant, and representations made by the Defendant.
 7. Based on Defendant's representations, the parties agreed on a value of $40,000.00 as the Defendant's interest in his business.
 8. The trial court issued a decision, taking into consideration the agreed-upon value of the Defendant's interest in his business.
 9. Several months after the trial, and after the decision, Defendant's business was sold for Six Million ($6,000,000.00) Dollars.
 10. During the prolonged pendency of the above matter, Defendant had not revealed that any sale was pending, or that an offer to purchase his business had been made, and, in fact, Defendant had denied any efforts or plans to sell said business.
 11. In spite of diligent efforts on the part of the Plaintiff to discover the true value of the Defendant's interest in his business, the Defendant did not disclose to the Plaintiff that any negotiations or discussions regarding sale of said business were transpiring during the pendency of the divorce, and so the Defendant misrepresented the value of his business.
 12. The Defendant has committed fraud, both with respect to the Plaintiff and with respect to the Court.
 Wherefore, Plaintiff respectfully requests that the Court reopen the Judgment of Dissolution of Marriage for the purpose of dividing the marital assets.
The Plaintiff,
By: s/ Susan W. Wolfson
CT Page 14450
SUSMAN, DUFFY SEGALOFF, P.C.
Her Attorneys
Rule To Show Cause, August 4, 1999 [182.75]
The court heard the parties on January 4 and 5, 2001. At the request of the court, defendant's counsel indicated which paragraphs of the Rule to Show Cause defendant admitted, denied, etc. Defendant admits ¶¶ 1, 2, 4, 5, 6, 7 and the first sentence of ¶ 3. Defendant also admits that PTI was sold for $6,000,000. Defendant denies ¶¶ 10, 11, and 12. {4/2-5}
PTI was "a small computer company and presently operates in a specialized field of smart cards." Memorandum of Decision, May 12, 1998, p. 1. [170]
PTI as it existed in 1998 was the latest of us several corporations bearing that name. The succession of PTI corporations need not be recounted here. William Mangino was the founder of the original PTI. In 1993 defendant joined the original PTI. At that time, he invested a little less $10,000 in PTI. For that, he received a 47 1/2 percent of the company stock. Since Mangino had put in a little more than $10,000, he owned 52 1/2 percent of the stock. Defendant never invested any more funds in PTI. In 1995 or 1996, defendant loaned PTI between 60 to 70,000 dollars. In approximately 19%, two other individual investors became shareholders. Together the two held approximately 18% of the stock.
In 1996, Weinstein sold 450 of the 905 shares he then owned in the then PTI, a Florida Subchapter S corporation, to Mangino. {4/48} When the present PTI was formed in 1996, Weinstein's 455 shares of the Florida S corporation became 4550 shares in the present PTI, a Connecticut C corporation. Those 4550 shares represented approximately 20% of the outstanding shares of PTI. {4/49-50}
Both ICL and PTI were involved in the business of developing and selling smart card systems. They had worked together on the smart card software for more than half of PTI's existence, i.e., since at least 1994. They had a Software Licensing Agreement dated February 26, 1995.
As of 1998, ICL and PTI had a four-year relationship. The two companies worked together on certain types of software. There were disputes between the two since 1995.
The Software Licensing Agreement permitted either party to terminate upon giving six months notice. As of March 1998, the relationship had CT Page 14451 soured to the point that ICL sent PTI written notice of termination effective September 26, 1998. Exhibit A.
From time to time over the years, PTI and ICL met to discuss business issues. In April 1998, representatives of ICL and PTI met in London. Weinstein attended. The specific purpose or purposes of the meeting are not clear. This meeting was only two weeks after ICL's notice of termination of that agreement. The termination of the Software Licensing Agreement was discussed. There was an argument over the rights to the software PTI and ICL had worked on together. {4-17-98, 24; 4/33}
There is some evidence that an acquisition of PTI by ICL was discussed. The only evidence that an acquisition was discussed was the deposition testimony of Attorney Alan Wain. Wain was an in-house attorney for ICL; his office was in New Jersey. The day before the London meeting, his boss, Richard Christou, an ICL general counsel, called him and asked him to attend the meeting in London. Christou, according to Wain, mentioned a possible acquisition. Wain was given no details or materials before the meeting. He had no prior knowledge of PTI. Wain was not told why ICL interested in PTI. Wain flew over on the "red eye." At the meeting there were seven or eight people present. Wain did not know any of them, even the ICL people. Mangino and Weinstein were present.
Wain's recollection of the meeting was "very sketchy." But, "it was just a broad discussion, as I remember, about what PTI is and whether or not it would make sense for ICL to buy PTI." {39} When asked about the discussion whether ICL should buy PTI and who said what, Wain answered: "Oh, I wouldn't remember anything, any of that. I don't remember who was there." {39} When asked about the discussion on whether the acquisition made sense, Wain again had no recollection: "I don't recall that meeting as to what was discussed. I could only think in my mind what you would normally discuss, so I can't guess as to what was said to whom." {39-40} "What was exactly discussed at that meeting, I can't tell you." {40} "What happened that day I don't recall." {104}
Both Mangino and Weinstein testified that acquisition was not discussed. Mangino, {4/23-24}; Weinstein, {4/119}
For several reasons, Wain's testimony that an acquisition was discussed is suspect. His testimony was that his recollection of the meeting was "very sketchy." He was tired. The meeting "was too long ago." {40} Most telling is the evidence, discussed below, that the idea for the acquisition originated after Philip Eames was hired in May 1998 as managing director of ICL's smart card business.
The court believes Wain was mistaken in testifying on November 27, 2000 CT Page 14452 by deposition that an acquisition was discussed at the April 6, 1998 London meeting.
There is no credible evidence that ICL's acquiring PTI was even broached at the April 6, 1998 meeting in London.
The finds that ICL's purchase or possible purchase of PTI was not discussed at the April 6, 1998 meeting in London.
In April or May 1998, PTI participated in a trade show. PTI spent over $100,000 on making a big splash at the trade show. They convinced the show organizers to use PTI's SmartCity cards at the show, issuing each attendee a SmartCity card to use in purchasing lunches, using vending machines, etc. Each card had an amount of "money on it" advanced by the organizers permitting that amount of money to be used via the card for purchasing lunches, wares from vending machines, etc. Since this trade show was directed largely to those in the smart card business, having PTI's SmartCity card issued by the organizers to all those attending the show was somewhat of a coup for PTI.
ICL also attended the trade show. Mangino and Weinstein talked with representatives of ICL during the trade show. Aside from general business conversation, the parties discussed their conflicting claims regarding the intellectual property rights in the software. [4/28]
There is no evidence ICL's purchase of PTI was mentioned or discussed at the trade show.
In May 1998 ICL appointed Philip Eames as managing director of its smart card business. ICL had internal discussions "from May" on what ICL would do with PTI. Ross Bailey, a 24-year employee of ICL, was then infrastructure purchasing manager for ICL's financial services division. Eames had Bailey take a look at PTI. Bailey was to look at PTI with a view to deciding how ICL's relationship with PTI should proceed. Bailey's look at PTI did not involve a review of PTI's financial records. Bailey did not make a financial valuation. According to Bailey, his work was "concept planning." Bailey looked at the way the PTI's SmartCity software and SmartCity business would fit into ICL's overall smart card strategy.
For some time ICL and PTI were threatening each other with litigation over their respective claims to the smart card software. ICL believed it had two options: (1) the relationship continued to decline and proceed to litigation, or, (2) buy the rights to the software. Bailey was to determine if it was worth buying the PTI operation.
Bailey visited PTI at its offices in June 1998. On June 8th Bailey CT Page 14453 flew over from London and had dinner with Mangino and Weinstein. The next day he went to PTI's office.
Bailey testified about considerations made in determining whether a purchase was in ICL's interests. ICL wanted to further develop its smart card business. ICL and PTI had had a lengthy relationship. ICL and PTI had jointly developed smart card software. PTI's SmartCity applications had advantages and features beyond those in the jointly developed software. Bailey believed PTI was an attractive acquisition for ICL because ICL had managed to sell only one systems worth of its smart card software in Europe. On the other hand, PTI had sold many Smart City systems in the United States and Russia with far less effort than ICL was expending. PTI had value to ICL because of the expertise PTI brought to play.
Sometime shortly after Bailey's visit to PTI, Eames recommended ICL's purchase of PTI.
In early June, a meeting was scheduled for June 15, 1998 at PTI's office.
On June 15, 1998, representatives of PTI (Mangino and Weinstein) and ICL met in Middletown. Philip Eames and Attorney Wain were present for ICL. {4/73} It is not clear who else attended on behalf of ICL.
It is now clear that ICL's purpose was to offer to buy PTI to get the improvements and know-how PTI had developed for PTI's SmartCity program. At that meeting, ICL claimed it had superior rights to the jointly developed software and that PTI had no, or at most, inferior rights thereto. It then offered to purchase all of PTI outright for $2,500,000 and thereby avoid litigation which would be lengthy, expensive, and with less than certain result. While any such litigation was pending over the intellectual property rights residing in the software, neither party could freely market its systems which embraced those contested rights. Thus, from ICL's point of view a quick purchase of PTI made great sense.
There is no evidence that PTI had any hint that ICL was going to make an offer to purchase. The meeting with ICL was scheduled for June 15. PTI also had a meeting scheduled with Hewlett Packard for the following day to discuss possible investment by Hewlett-Packard. Hewlett-Packard did cancel that meeting before June 15. In fact, Mangino said the offer to purchase "came out of the blue." The court adopts this characterization.
At the meeting, ICL took the position that ICL owned the disputed intellectual property rights. CT Page 14454
ICL offered to purchase all of the stock in PTI for $2,500,000. Mangino and Weinstein were shocked. The offer, in fact any offer, to purchase was totally unanticipated. Nevertheless, they (Mangino and Weinstein) rejected it.
ICL's representatives were miffed; they left the meeting. The meeting had only lasted perhaps 40-45 minutes.
Mangino and Weinstein were not interested in selling for $2,500,000. They had invested considerable money in PTI. Much effort had been invested. They had put four to five years into PTI. They hoped "to grow the business" into something else.
The court does not infer from Mangino and Weinstein's refusal of the $2,500,000 offer that PTI was worth more than that sum or even worth that much. Likewise, the refusal does not imply Mangino and/or Weinstein thought PTI was worth $2,500,000 or more.
Mangino and Weinstein believed PTI had a far better claim to the intellectual property rights than ICL claimed. The next day, June 16, ICL's attorney, Wain wrote to Mangino and Weinstein stating "the intellectual property rights in the SmartCity product are held and shared equally by the parties." He then expressed disappointment in the failure to reach agreement on a purchase price and hope that an acquisition will happen. Vain also stated that if an acquisition did not occur, ICL expected PTI to give ICL "a complete copy of all of the code, including source code, and all of the documentation." If PTI did not turn this material over to ICL, ICL "will have no choice but to pursue our legal remedies." Letter dated June 16, 1998, Alan P. Wain to Bill Mangino and Luke A. Weinstein. Exhibit 12.
Weinstein responded on June 17. He disputed ICL's claims to the intellectual property rights and claims to software PTI had developed. Weinstein stated that ICL's legal position was misleading ICL's management on the value of PTI to ICL; that misleading interpretation had a negative impact on the valuation of PTI. Weinstein then pointed out several provisions of the Software Licensing Agreement. Weinstein listed developments PTI had made for PTI's SmartCity applications. According to Weinstein, each of the developments he listed, and more, were "Non Core Enhancements" under the Software Licensing Agreement. As such they belonged to PTI alone under the provision that "[t]he Intellectual Property rights in Non Core Enhancements shall be retained by the Party independently developing such Non Core Enhancements." Letter dated June 17, 1998 to Alan P. Wain from Luke A. Weinstein. Exhibit 11.
Weinstein concluded his letter stating: CT Page 14455
 "PTI Management clearly understood at the meetings on Monday that your position on IPR [intellectual property rights] is a major factor in the low valuation of PTI. If this poistion is seriously flawed, then so is the valuation." Exhibit 11.
Apparently, ICL's Eames called Mangino and or Weinstein approximately a week later and said ICL would like to come back and talk with PTI again. A July 1st date was set for a meeting. {4/83}
At that meeting, a Memorandum of Understanding was executed. It called for a sale price of $6,000,000 and a closing by September 30, 1998. Exhibit 14.
On October 1, 1998, the sale was closed. An Acquisition Agreement was executed. Exhibit 2. Other collateral agreements were executed. E.g., Employment, Confidentiality and Non-Competition Agreement. Exhibit 16. Weinstein also got a 3-year employment agreement. It provided him an annual salary of $150,000, and the possibility/opportunity for a bonus each year of up to $150,000. He also got a $600 per month car allowance. Also, when the sale closed, defendant's loan of $63,400 plus interest was paid. Defendant received other benefits as a result of his employment with ICL.
Plaintiff claims the defendant "committed fraud" because "[d]uring the prolonged pendency of the above matter, Defendant had not revealed that any sale was pending, or that an offer to purchase his business had been made, and, in fact, Defendant had denied any efforts or plans to sell said business" and, "the Defendant did not disclose to the Plaintiff that any negotiations or discussions regarding sale of said business were transpiring during the pendency of the divorce, and so the Defendant misrepresented the value of his business." Rule To Show Cause, August 4, 1999, ¶¶ 10, 11, and 12. [182.75]
The law applicable to this case is straightforward:
 "There are three conditions necessary to a trial court's granting of relief from a dissolution judgment secured by fraud: (1) There must have been no laches or unreasonable delay by the injured party after the fraud was discovered. (2) There must be clear proof of the perjury or fraud. (3) There must be a substantial likelihood that the result of the new trial will be different. Billington v. Billington, 220 Conn. 212, 218, 595 A.2d 1377 (1991)." Castro v. Castro, 31 Conn. App. 761, 768 (1993). CT Page 14456
The first or "no laches or unreasonable delay" condition is not an issue in this case. Defendant so conceded. {4/ }
During the hearing, the court, not artfully, asked plaintiff's counsel: ". . . And in order for you to prevail, don't you have to . . . show that the seeds of this acquisition, at least the seeds of this acquisition, were planted and well watered before the trial?" Plaintiff's counsel responded: "Yes, your Honor. I do need to show that." Transcript of Proceedings, January 4, 2001, p. 83.
As in any fraud case, the burden of proving fraud is upon the party claiming fraud. The standard of proof is elevated. "There must be clear proof of the perjury or fraud." Billington v. Billington, 220 Conn. 212,218 (1991). Castro v. Castro, 31 Conn. App. 761, 768 (1993).
The Appellate Court has elaborated:
 "The party claiming fraud must satisfy a standard of proof more exacting than the probability standard generally applicable in civil cases. Alaimo v. Royer, 188 Conn. 36, 39, 448 A.2d 207 (1982). In attempting to define this elevated standard, our decisions have used such phrases as `clear and satisfactory evidence'; Miller v. Appleby, 183 Conn. 51, 55, 438 A.2d 811 (1981); `clear, precise and unequivocal evidence'; DeLuca v. C. W. Blakeslee Sons, Inc., 174 Conn. 535, 546, 391 A.2d 170 (1978); and "`clear, convincing and unequivocal evidence'". "Dunham v. Dunham, 204 Conn. 303, 322, 528 A.2d 1123 (1987)." Pinder v. Pinder, 42 Conn. App. 254, 263 (1996).
Plaintiff recognizes "the standard of proof for fraud is a strict one." Memorandum of Law in Support of Plaintiff's Application for Rule to Show Cause, January 5, 2001, p. 12. [199.50]
With these principles in mind, the court concludes that the plaintiff has not proved, even by the lower preponderance of the evidence standard, that defendant knew of the eventual sale to ICL as of the time of trial on April 15 and 16, 1998. The evidence is clear that ICL had not proposed, or even broached, an acquisition until June 15, 1998. In fact, ICL first began considering an acquisition internally in May 1998 after its hiring of Phillip Eames. There is no evidence these internal discussions were communicated or known to Mangino and/or Weinstein. Furthermore, ICL's decision to propose an acquisition did not occur until after Bailey had made his report on the value of PTI to ICL. This was CT Page 14457 after his June 8-9, 1998 visit to PTI. hall this necessitates a finding that Weinstein was not aware of any sale or acquisition until mid-June, approximately two months after trial.
Other action by defendant indicates he did not know of the sale. The decision on the Weinstein's dissolution was issued on May 12, 1998. On May 29, 1998, defendant filed a Motion for Reargument/Reconsideration dated May 26, 1998. [173] Essentially, defendant claimed the court's judgment would "strip him bare" despite the court's having said during the trial, "The Court will not strip him bare giving it all to her." Id., ¶ 2. Necessarily, by filing the motion, defendant invited plaintiff and the court to take another look at his financial condition.
Defendant is not unintelligent. If defendant had known of the sale as early as the mid-April trial, its hard to believe he would have risked disclosure of the previously concealed sale by filing the Motion for Reconsideration/Reargument; a risk inherent in the filing of the motion. This bolsters the court's finding that defendant was unaware of any sale to ICL in mid-April 1998.
The defendant's Motion for Reargument/Reconsideration was on the Monday June 15, 1998 family short calendar. Judge Higgins heard the matter on that day. Defendant's counsel appeared on his behalf; defendant was not in court. Transcript of Proceedings, June 15, 1998. Exhibit 13. The motion was denied on June 16, 1998.
The court finds and concludes that as of the time of trial, April 16 and 17, 1998, there was no sale pending, no offer to purchase had been made, and, no negotiations or discussions regarding sale of the business had taken place. [See Rule To Show Cause, ¶¶ 10, 11.]
After plaintiff filed the instant Rule To Show Cause, plaintiff learned PTI had had a Private Placement Memorandum issued in 1997. It was updated later in 1997 and in early 1998. The existence of the memoranda had not been disclosed to plaintiff, her attorney, or the "business evaluator" she employed to determine the value of defendant's interest in PTI, Kenneth Pia.
Plaintiff's seems to claim the failure to disclose the Private Placement Memoranda comes within the allegations or purview of the Rule to Show Cause. It is the court's view that it does not. Nevertheless, because of the importance of this dispute to the parties, and in the interest of completeness and finality, the court will decide whether defendant committed fraud by not disclosing the existence of the Private Placement Memoranda. CT Page 14458
Plaintiff is correct; defendant had not disclosed the existence or issuance of the Private Placement Memoranda. Whether, under the circumstances, his not doing so constitutes fraud must be decided. Plaintiff again has the burden of proving the alleged fraudulent non-disclosure by the heightened "clear and convincing evidence" standard of proof.
In order to raise capital, Mangino and Weinstein had an investment banking firm, Gerard Klauer Mattison Co., Inc. (GKM), prepare and issue a Confidential Private Placement Memorandum for PTI. The date of the original Private Placement Memorandum was May 8, 1997. Exhibit 1.
The Private Placement Memoranda for PTI offered to sell "to certain qualified purchasers 12,000 shares of Series A Preferred Stock, no par value per share . . . at a purchase price of US $416.97 per share. . . . No public trading market exists for the Preferred Stock and none is expected to develop after the Offering." The Offering, if totally subscribed would raise $5,000,000. Exhibit 1, p. 1.
The Private Placement Memorandum was sent to 80-100 potential investors. One was given to ICL in the latter half of 1997.
There is no evidence the Private Placement Memoranda produced anything positive for PTI. Mangino "guess[ed]" there were 15-20 responses to the Memoranda. PTI met with at least some of the persons or entities who had responded; the possibility of the type of investment offered in the Memoranda was discussed. Otherwise, the evidence does not disclose the nature of the inquiries or the content of the discussions which occurred as a result of the Private Placement Memoranda. There were no concrete offers to invest money in PTI. {4/26-27}
Apparently, no would-be investor or investors were willing to invest as offered in the Memoranda. There is no evidence any would-be investors expressed any interest in investing in PTI in a way other than as offered in the Private Placement Memoranda as a result of the Private Placement Memoranda. There is no evidence the Private Placement Memoranda caused any offer to invest in PTI by anyone.
The court does not pretend to have any sophistication regarding private placement memoranda. The court can find no correlation between the $5,000,000 Offering Price for 12,000 shares of Series A Preferred Stock of PTI and the value of PTI. There is no evidence of any such correlation. The court finds there is none. Thus, the court rejects outright plaintiff's assertions the Private Placement Memoranda "val[ued] 33% of PTI at $5,000,000." See Memorandum of Law in Support of Plaintiff's Application for Rule to Show Cause, January 5, 2001, P. 3. CT Page 14459 [199.50] Plaintiff's contends "PTI had an assessed value of $10,000,000 which is evidenced by the Private Placement Memorandums dated, May 8, 1997 and March 27, 1998." Id., p. 13. That statement is just not true.
At a meeting between ICL and PTI held in London in late August or September, Mangino mentioned to Andrew Neill, an official of ICL, that PTI had a Private Placement Memoranda. Neill asked for a copy; a copy was provided a few months later. Weinstein was not present at that London meeting. {4/20-22}
Mangino testified the Private Placement Memorandum was discussed with ICL probably in 1997. {4/22-23} There is no evidence of who the persons were who participated in the discussion. There is no evidence of the scope or content of such a discussion. They (ICL and PTI) did not meet to discuss the Private Placement Memorandum; it was not discussed at any meeting. {4/23} There were no communications, written or meetings, with ICL about the Private Placement Memoranda in 1998. {4/23}
Mangino was asked "what started the ball rolling relative to [ICL's] offer to purchase [PTI]. Mangino said ICL "hired a person to look closer at the company [PTI]. Mangino then was asked: "And was that all started by your Private Placement Memorandum?" Mangino answered: "I guess." {4/29} The court discounts Mangino's guess.
While Mangino was testifying, the court asked him: "Well, what happened on June 15th of significance?" Mangino answered: "They came over to — they came over to discuss with us the Private Placement Memorandum. And at that time they indicated that they were more interested in acquisition rather than an investment." {4/41} There is no evidence of the basis for Mangino's thought that ICL "came over to discuss with us the Private Placement Memorandum." The court does not accept that part of Mangino's testimony. Among other considerations, it is not consistent with the credible evidence in the case.
There is no evidence there were any discussions between ICL and PTI about the Memoranda between the time ICL was provided with the Private Memorandum in 1997 and June 15, 1998. {4/23} There is no evidence ICL indicated any interest in buying PTI during that period. {4/41-42}
There is no credible evidence ICL's decision to acquire PTI was influenced by or in any way the result of the Private Placement Memoranda. There is no evidence that the Private Placement Memoranda were even remotely instrumental in bringing about ICL's decision to acquire PTI.
Plaintiff claims defendant should have disclosed the existence of the CT Page 14460 Private Placement Memoranda before trial and his failure to do so constitutes a fraud. According to plaintiff, the circumstances required defendant to disclose the Private Placement Memoranda to her before trial. Plaintiff implies she would not have stipulated at trial that defendant's interest in PTI was only $40,000.
The parties engaged in much discovery before trial. There was formal discovery, i.e., interrogatories, depositions, and requests for production. Hardly any of the formal discovery was introduced in evidence.
The record does contain some interrogatory responses sworn to by defendant which are relevant. The interrogatories and responses are:
 6. Has PTI been approached, or any contacts made by any other group concerning any transactions involving the sale and/or purchase of business interests?
 Defendant objects to this interrogatory . . . However with the exception of information already disclosed during depositions, no offers have been made and no agreement in principle or otherwise has been contemplated, proposed or made.
 7. Has PTI applied for new financing in the last two years with any banks or financial institutions?
 Defendant objects to this interrogatory . . . However without waiving the objection, the answer is yes.
8. If so, to whom has PTI applied and when?
 Defendant objects to this interrogatory . . . However without waiving the objection, PTI applied to Fleet Bank in September 1997.
 Affidavit — Sworn Interrogatories, December 16, 1997. (Luke Weinstein) Exhibit 20.
The interrogatory responses set forth above indicate defendant was asked if PTI had been approached regarding a sale/purchase of PTI. See #6. Defendant's responses were sworn to on December 16, 1997. There is no evidence before the court even hinting that ICL had approached PTI before December 16, 1997 about an acquisition or purchase. In fact, the convincing evidence is that the idea for an acquisition first saw the CT Page 14461 light of day within ICL in May 1998; it was first communicated to PTI, Mangino and Weinstein on June 15, 1998. See discussion at pp. 12-15. The court finds no lack of candor in defendant's December 16, 1997 response to interrogatory #6.
Interrogatory #7 asks whether PTI had "applied for new financing in the last two years with any banks or financial institutions?" Weinstein answered "Yes." He further answered that PTI had applied to Fleet Bank in September 1997. The interrogatory language, "applied for new financing . . . with any banks or financial institutions" ordinarily would mean debt financing; it would not normally encompass solicitation of an equity investment. The court cannot find that defendant was obliged to disclose the existence of the private placement memoranda when responding to interrogatory #s 7 and 8. The court concludes that defendant was not dishonest in his December 16, 1997 responses to interrogatories #s 7 and 8. [Exhibit 20]
Since the Interrogatory Responses dated December 16, 1997 (Exhibit 20) are the only parts of the formal discovery in evidence, the court concludes nothing else in the formal discovery is relevant to the question of whether defendant should have disclosed that PTI had issued Private Placement Memoranda in 1997 and 1998.
There is no evidence that plaintiff asked in any of the formal discovery if there were any efforts to raise equity capital. The court assumes that if such an inquiry had been made during the formal discovery, evidence of that inquiry and defendant's response would have been introduced in evidence. The absence of such evidence militates against a finding that defendant committed fraud during formal discovery by not revealing the Private Placement Memoranda. As stated, Weinstein never told plaintiff, or those working for her, about the Private Placement Memoranda. The court does not know the contents of the formal discovery. Thus, the court cannot decide if a particular deposition question, interrogatory, etc., called for disclosure of the Private Placement Memoranda.
The evidentiary void of any parts of the formal discovery which would have called for disclosure of the issuance of the Private Placement Memoranda is quite significant. If the honest response to a deposition question, interrogatory, request for production, and/or request for admission called for disclosure of the issuance of the Private Placement Memoranda, surely, plaintiff would have introduced that deposition question, interrogatory, request for production, and/or request for admission in evidence and rightfully made a great to-do about it. But, here the absence of same cuts deeply against plaintiff's claim. CT Page 14462
There is no evidence upon which the court could find that defendant acted dishonestly in his responses to plaintiff's formal discovery.
In addition to the formal discovery permitted by the rules of practice (interrogatories, depositions, requests for production), there was "informal" discovery. For example, Weinstein met with plaintiff's "business evaluator," Kenneth Pia, in December 1997. They discussed PTI. Weinstein gave Pia PTI's financial statements, etc., and gave other information relating to PTI, its business and his(Weinstein's) view of PTI's prospects.
Kenneth Pia and defendant met in December 1997 in what the court calls "informal discovery." The purpose of the meeting was for Pia to get information from Weinstein about PTI so that he (Pia) could appraise the value of PTI and defendant's interest therein. There is no written record in evidence of their meeting. Neither participant's (defendant's or Pia's) notes, if any, are in evidence. The parties dispute whether Pia asked defendant any question or questions which would have for called defendant's telling Pia of PTI's Private Placement Memoranda. Pia testified he never asked defendant about a private placement memorandum in those specific words. {4/157} Defendant says he was not asked anything which called for his telling Pia of the Private Placement Memoranda.
Plaintiff states in brief: "Mr. Pia asked Mr. Weinstein if PTI had a business plan. The response was negative." Memorandum of Law in Support of Plaintiff's Application for Rule to Show Cause, January 5, 2001, p. 2. [199.50]
Pia was asked if he (Pia) had asked defendant if he (defendant) had a "business plan." Pia responded: "I believe through the deposition that was one of the questions that we had posed." The court takes Pia's response to mean that Pia had not asked defendant about a business plan when he (Pia) and defendant met in December 1997.
Plaintiff has not made any part of the transcript of defendant's deposition testimony a part of the evidentiary record in this proceeding. However, defendant testified that he had said during his deposition that PTI did not have a business plan. {4/110}
Plaintiff contends that defendant committed fraud in not revealing the existence of the Private Placement Memoranda because he denied PTI had a business plan.
The evidence does not inform the court what a "business plan" is. Pia was asked if he would expect "that a question such as is there a business plan would evoke a response revealing the existence of a Private Placement CT Page 14463 Memorandum." Id. 141. Pia did not answer the question directly but responded: "A Private Placement Memorandum is in fact a plan for the company." Id., 141-142. The court does not accept Pia's statement as defining a business plan.
Vital to this part of plaintiff's claim is the premise that a private placement memorandum is, or contains, a business plan. There is no clear and convincing evidence upon which the court could make such a finding or conclusion to that effect.
By the time of the court's hearing on the Rule to Show Cause, plaintiff had had the Private Placement Memoranda for some time. Plaintiff did not have any witness define "business plan." Plaintiff did not have any witness point out the "business plan" in the Private Placement Memoranda. Plaintiff has not shown the court either in brief or oral argument that the Private Placement Memoranda contained PTI's "business plan."
Therefore, defendant did not act fraudulently in not revealing the Private Placement Memoranda insofar as the claim of fraud is predicated on his denying PTI had a "business plan."
Plaintiff and Pia also maintain defendant should have revealed the existence of the Private Placement Memoranda when he was asked if applications had been made to banks for financing. Pia implies that when the question about bank financing was asked, defendant should have revealed all attempts or efforts to reach any source of capital, not just those directed obtaining a loan. The court rejects this thesis. Bank financing generally means a loan; banks do not ordinarily make equity investments in companies of PTI's size and tenure. The court is far from convinced defendant should have revealed the Private Placement Memoranda when asked if PTI had sought bank financing. See also discussion re Interrogatories 7 and 8 in Exhibit 20 above, pp. 28-29.
Pia claims he would have expected defendant to have told him of the Private Placement Memoranda. Pia never asked defendant about a private placement memorandum in those specific words. {4/157} However, during the December 1997 Pia/defendant meeting, Pia says he asked defendant questions which he (Pia) says should have elicited the existence of the Private Placement Memoranda. The court has reviewed carefully the transcript of Pia's testimony. Pia's testimony does not afford clear and convincing evidence of circumstances which required defendant to disclose the issuance of the Private Placement Memoranda.
As of the mid-December 1997 Pia-defendant meeting, the original Private Placement Memorandum had been out for seven months. As a capital raiser, CT Page 14464 it was a dud. There is no evidence as of December 1997 defendant was basing any plans for PTI's future on capital coming from the Private Placement Memoranda.
The heart of the matter is that there is no evidence Pia or anyone else working on behalf of plaintiff ever asked if PTI was trying to raise equity capital, and, if so, how.
The court finds that plaintiff has not established by clear and convincing evidence any circumstances which required defendant to have told her, or those working on her behalf, that PTI had prepared and issued Private Placement Memoranda.
The court has expended considerable effort and time determining plaintiff's claim that defendant acted fraudulently in not disclosing the Private Placement Memoranda. That effort was perhaps wasted.
In order for plaintiff to prevail, she must establish "[t]here [is] a substantial likelihood that the result of the new trial will be different." Billington v. Billington, 220 Conn. 212, 218 (1991); Castrov. Castro, 31 Conn. App. 761, 76B (1993).
The court assumes, without deciding, that this element need only be proven by the lover "preponderance of the evidence standard."
As of the time of the hearing on Rule To Show Cause, plaintiff and Pia had had the Private Placement for some time. No evidence was introduced that any information about PTI in the Private Placement Memoranda, aside from the Private Placement Memoranda itself and the offer contained therein, was not previously known to plaintiff, her counsel and Mr. Pia.
The thrust of plaintiff's claim is that she would not have stipulated at the April 1998 dissolution trial to the $40,000 valuation if she had known of the Private Placement Memoranda. According to plaintiff, the trial court relied on the parties' stipulated valuation of $40,000. Plaintiff contends the judgment provisions would have been different if the court had known defendant's stock was worth far more than only $40,000. The questions here are whether plaintiff, if she had had the Private Placement Memoranda before trial and based on information in the Private Placement Memoranda not otherwise known to plaintiff (1) would not have agreed upon the $40,000 valuation, (2) would have presented evidence that the value was greater than $40,000, and (3) would have been able to convince the trial court the value was significantly greater than $40,000.
Pia had not testified at the trial. While he initially believed CT Page 14465 defendant's interest in PTI was somewhat more than $40,000 ($70 to 80,000), he eventually came to the conclusion that Weinstein's $40,000 was close enough. As a result, plaintiff did not contest defendant's figure at trial. The parties "stipulated" at trial that defendant's minority interest in PTI was worth $40,000. {4/16/98, 99-100}
Pia testified at the January 2001 hearing on the instant Rule To Show Cause. This was a year and eight months after the April 1998 trial. Pia's testimony has been examined closely. As of the hearing. Pia and plaintiff then had the Private Placement Memoranda. Pia did not testify that he learned anything from the Private Placement Memoranda which changed his opinion of the value of PTI and defendant's interest therein as of April 1998. Pia did not testify that defendant's interest in PTI in April 1998 was worth anything other than what he (Pia) and plaintiff had agreed it was worth, $40,000. Significantly, Pia did not testify that he gained any information as a result of the Private Placement Memoranda that altered "his opinion of the value of defendant's interest in April 1998.
Quite telling is the fact that plaintiff's counsel did not ask Pia any questions designed to elicit information that if plaintiff and/or Pia had had the Private Placement Memoranda before the April 1998 trial, his opinion on the value would have been different. This suggests quite strongly plaintiff knew that Pia learned nothing from the Private Placement Memorandum about the April 1998 value of PTI upon which to revamp his April 1998 position that the defendant's interest was in the order of $40,000.
There is no evidence that plaintiff's having the Private Placement Memoranda in or before April 1998 would have changed anyone's view of the value of defendant's PTI stock. There is no evidence the court would have found a different value for that stock.
Plaintiff presented no evidence how she would have proceeded differently at trial if she had the Private Placement Memoranda.
The court has examined the original Private Placement Memorandum dated May 8, 1997. It is the only version in evidence. [The court also reviewed the March 27, 1998 version, Exhibit L, Deposition of Alan Wain, November 27, 2000. It is not clear whether the Wain deposition exhibits are full exhibits in this Rule To Show Cause proceeding. The March 27, 1998 version is not significantly different from the original version] Again, the court claims no particular sophistication regarding same. But, as the fact-finder in this proceeding, the court has examined the Memorandum to determine if there is anything therein which would inform the court that the value of PTI, and defendant's interest, were substantially more than the parties apparently thought in April 1998. The court's effort was for CT Page 14466 naught; tea leaves would be as informative.
The absence of any such evidence means there is no evidence "[t]here [is] a substantial likelihood that the result of the new trial will be different."
Plaintiff has not established "[t]here [is] a substantial likelihood that the result of the new trial will be different."
The plaintiff's Rule to Show Cause and request to open and or set aside the judgment are denied.
Parker, J.